BRECHT *v.* ABRAHAMSON, SUPERINTENDENT,
DODGE CORRECTIONAL INSTITUTION

No. 91–7358.   Argued December 1, 1992—Decided April 21, 1993

620

REHNQUIST, C. J., delivered the opinion of the Court, in which STEVENS, SCALIA, KENNEDY, and THOMAS, JJ., joined. STEVENS, J., filed a concurring opinion, *post,* p. 639. WHITE, J., filed a dissenting opinion, in which BLACKMUN, J., joined, and in which SOUTER, J., joined except for the footnote and Part III, *post,* p. 644. BLACKMUN, *post,* p. 650, O'CONNOR, *post,* p. 650, and SOUTER, JJ., *post,* p. 657, filed dissenting opinions.

*Allen E. Shoenberger,* by appointment of the Court, 505 U. S. 1202, argued the cause and filed briefs for petitioner.

*Sally L. Wellman,* Assistant Attorney General of Wisconsin, argued the cause for respondent. With her on the brief was *James E. Doyle,* Attorney General.

*Attorney General Barr* argued the cause for the United States as *amicus curiae* urging affirmance. On the brief were *Solicitor General Starr, Assistant Attorney General*

*Mueller, Deputy Solicitor General Roberts, Ronald J. Mann,* and *Vicki S. Marani.**

CHIEF JUSTICE REHNQUIST delivered the opinion of the Court.

In *Chapman* v. *California*, 386 U. S. 18, 24 (1967), we held that the standard for determining whether a conviction must be set aside because of federal constitutional error is whether the error "was harmless beyond a reasonable doubt." In this case we must decide whether the *Chapman* harmless-error standard applies in determining whether the

*Steven R. Shapiro, John A. Powell, Leon Friedman,* and *Larry W. Yackle* filed a brief for the American Civil Liberties Union et al. as *amici curiae* urging reversal.

Briefs of *amici curiae* urging affirmance were filed for the State of California et al. by *Daniel E. Lungren,* Attorney General of California, *George Williamson,* Chief Assistant Attorney General, *Dane R. Gillette,* Deputy Attorney General, and *Mark L. Krotoski,* Special Assistant Attorney General, *James H. Evans,* Attorney General of Alabama, *Charles E. Cole,* Attorney General of Alaska, *Winston Bryant,* Attorney General of Arkansas, *Gale A. Norton,* Attorney General of Colorado, *Richard N. Palmer,* Chief State's Attorney of Connecticut, *Larry EchoHawk,* Attorney General of Idaho, *Linley E. Pearson,* Attorney General of Indiana, *Robert T. Stephan,* Attorney General of Kansas, *Chris Gorman,* Attorney General of Kentucky, *Richard P. Ieyoub,* Attorney General of Louisiana, *Frank J. Kelley,* Attorney General of Michigan, *Michael C. Moore,* Attorney General of Mississippi, *William L. Webster,* Attorney General of Missouri, *Marc Racicot,* Attorney General of Montana, *Don Stenberg,* Attorney General of Nebraska, *Frankie Sue Del Papa,* Attorney General of Nevada, *Robert J. Del Tufo,* Attorney General of New Jersey, *Lee Fisher,* Attorney General of Ohio, *Ernest D. Preate, Jr.,* Attorney General of Pennsylvania, *T. Travis Medlock,* Attorney General of South Carolina, *Mark Barnett,* Attorney General of South Dakota, *Dan Morales,* Attorney General of Texas, *Paul Van Dam,* Attorney General of Utah, *Jeffrey L. Amestoy,* Attorney General of Vermont, *Kenneth O. Eikenberry,* Attorney General of Washington, *Mario J. Palumbo,* Attorney General of West Virginia, and *Joseph B. Meyer,* Attorney General of Wyoming; for the County of Wayne, Michigan, by *John D. O'Hair* and *Timothy A. Baughman;* and for the Criminal Justice Legal Foundation by *Kent S. Scheidegger* and *Charles L. Hobson.*

prosecution's use for impeachment purposes of petitioner's post-*Miranda*[1] silence, in violation of due process under *Doyle* v. *Ohio,* 426 U. S. 610 (1976), entitles petitioner to habeas corpus relief. We hold that it does not. Instead, the standard for determining whether habeas relief must be granted is whether the *Doyle* error "had substantial and injurious effect or influence in determining the jury's verdict." *Kotteakos* v. *United States,* 328 U. S. 750, 776 (1946). The *Kotteakos* harmless-error standard is better tailored to the nature and purpose of collateral review than the *Chapman* standard, and application of a less onerous harmless-error standard on habeas promotes the considerations underlying our habeas jurisprudence. Applying this standard, we conclude that petitioner is not entitled to habeas relief.

Petitioner Todd A. Brecht was serving time in a Georgia prison for felony theft when his sister and her husband, Molly and Roger Hartman, paid the restitution for petitioner's crime and assumed temporary custody of him. The Hartmans brought petitioner home with them to Alma, Wisconsin, where he was to reside with them before entering a halfway house. This caused some tension in the Hartman household because Roger Hartman, a local district attorney, disapproved of petitioner's heavy drinking habits and homosexual orientation, not to mention his previous criminal exploits. To make the best of the situation, though, the Hartmans told petitioner, on more than one occasion, that he was not to drink alcohol or engage in homosexual activities in their home. Just one week after his arrival, however, petitioner violated this house rule.

While the Hartmans were away, petitioner broke into their liquor cabinet and began drinking. He then found a rifle in an upstairs room and began shooting cans in the backyard. When Roger Hartman returned home from work, petitioner shot him in the back and sped off in Mrs. Hartman's car.

---

[1] *Miranda* v. *Arizona,* 384 U. S. 436 (1966).

Hartman crawled to a neighbor's house to summon help. (The downstairs phone in the Hartmans' house was inoperable because petitioner had taken the receiver on the upstairs phone off the hook.) Help came, but Hartman's wound proved fatal. Meanwhile, petitioner had driven Mrs. Hartman's car into a ditch in a nearby town. When a police officer stopped to offer assistance, petitioner told him that his sister knew about his car mishap and had called a tow truck. Petitioner then hitched a ride to Winona, Minnesota, where he was stopped by police. At first he tried to conceal his identity, but he later identified himself and was arrested. When he was told that he was being held for the shooting, petitioner replied that "it was a big mistake" and asked to talk with "somebody that would understand [him]." App. 39, 78. Petitioner was returned to Wisconsin, and thereafter was given his *Miranda* warnings at an arraignment.

Then petitioner was charged with first-degree murder. At trial in the Circuit Court for Buffalo County, he took the stand and admitted shooting Hartman, but claimed it was an accident. According to petitioner, when he saw Hartman pulling into the driveway on the evening of the shooting, he ran to replace the gun in the upstairs room where he had found it. But as he was running toward the stairs in the downstairs hallway, he tripped, causing the rifle to discharge the fatal shot. After the shooting, Hartman disappeared, so petitioner drove off in Mrs. Hartman's car to find him. Upon spotting Hartman at his neighbor's door, however, petitioner panicked and drove away.

The State argued that petitioner's account was belied by the fact that he had failed to get help for Hartman, fled the Hartmans' home immediately after the shooting, and lied to the police officer who came upon him in the ditch about having called Mrs. Hartman. In addition, the State pointed out that petitioner had failed to mention anything about the shooting being an accident to the officer who found him in the ditch, the man who gave him a ride to Winona, or the

officers who eventually arrested him. Over the objections of defense counsel, the State also asked petitioner during cross-examination whether he had told anyone at any time before trial that the shooting was an accident, to which petitioner replied "no," and made several references to petitioner's pretrial silence during closing argument.[2] Finally, the State offered extrinsic evidence tending to contradict petitioner's story, including the path the bullet traveled through Mr. Hartman's body (horizontal to slightly downward) and the location where the rifle was found after the shooting (outside), as well as evidence of motive (petitioner's hostility toward Mr. Hartman because of his disapproval of petitioner's sexual orientation).

The jury returned a guilty verdict, and petitioner was sentenced to life imprisonment. The Wisconsin Court of

---

[2] The State's cross-examination of petitioner included the following exchange:

"Q. In fact the first time you have ever told this story is when you testified here today was it not?

.        .        .        .

"A. You mean the story of actually what happened?
"Q. Yes.
"A. I knew what happened, I'm just telling it the way it happened, yes, I didn't have a chance to talk to anyone, I didn't want to call somebody from a phone and give up my rights, so I didn't want to talk about it, no sir." App. 22–23.

Then on re-cross-examination, the State further inquired:
"Q. Did you tell anyone about what had happened in Alma?
"A. No I did not." Id., at 23.

During closing argument, the State urged the jury to "remember that Mr. Brecht never volunteered until in this courtroom what happened in the Hartman residence . . . ." Id., at 30. It also made the following statement with regard to petitioner's pretrial silence: "He sits back here and sees all of our evidence go in and then he comes out with this crazy story . . . ." Id., at 31. Finally, during its closing rebuttal, the State said: "I know what I'd say [had I been in petitioner's shoes], I'd say, 'hold on, this was a mistake, this was an accident, let me tell you what happened,' but he didn't say that did he. No, he waited until he hears our story." Id., at 36.

Appeals set the conviction aside on the ground that the State's references to petitioner's post-*Miranda* silence, see n. 2, *supra,* violated due process under *Doyle* v. *Ohio,* 426 U. S. 610 (1976), and that this error was sufficiently "prejudicial" to require reversal. *State* v. *Brecht,* 138 Wis. 2d 158, 168–169, 405 N. W. 2d 718, 723 (1987). The Wisconsin Supreme Court reinstated the conviction. Although it agreed that the State's use of petitioner's post-*Miranda* silence was impermissible, the court determined that this error "'was harmless beyond a reasonable doubt.'" *State* v. *Brecht,* 143 Wis. 2d 297, 317, 421 N. W. 2d 96, 104 (1988) (quoting *Chapman* v. *California,* 386 U. S. 18, 24 (1967)). In finding the *Doyle* violation harmless, the court noted that the State's "improper references to Brecht's silence were infrequent," in that they "comprised less than two pages of a 900 page transcript, or a few minutes in a four day trial in which twenty-five witnesses testified," and that the State's evidence of guilt was compelling. 143 Wis. 2d, at 317, 421 N. W. 2d, at 104.

Petitioner then sought a writ of habeas corpus under 28 U. S. C. §2254, reasserting his *Doyle* claim. The District Court agreed that the State's use of petitioner's post-*Miranda* silence violated *Doyle,* but disagreed with the Wisconsin Supreme Court that this error was harmless beyond a reasonable doubt, and set aside the conviction. 759 F. Supp. 500 (WD Wis. 1991). The District Court based its harmless-error determination on its view that the State's evidence of guilt was not "overwhelming," and that the State's references to petitioner's post-*Miranda* silence, though "not extensive," were "crucial" because petitioner's defense turned on his credibility. *Id.,* at 508. The Court of Appeals for the Seventh Circuit reversed. It, too, concluded that the State's references to petitioner's post-*Miranda* silence violated *Doyle,* but it disagreed with both the standard that the District Court had applied in conducting its harmless-error

inquiry and the result it reached. 944 F. 2d 1363, 1368, 1375-1376 (1991).

The Court of Appeals held that the *Chapman* harmless-error standard does not apply in reviewing *Doyle* error on federal habeas. Instead, because of the "prophylactic" nature of the *Doyle* rule, 944 F. 2d, at 1370, as well as the costs attendant to reversing state convictions on collateral review, *id.*, at 1373, the Court of Appeals held that the standard for determining whether petitioner was entitled to habeas relief was whether the *Doyle* violation " 'had substantial and injurious effect or influence in determining the jury's verdict,' " 944 F. 2d, at 1375 (quoting *Kotteakos* v. *United States*, 328 U. S., at 776). Applying this standard, the Court of Appeals concluded that petitioner was not entitled to relief because, "given the many more, and entirely proper, references to [petitioner's] silence preceding arraignment," he could not contend with a "straight face" that the State's use of his post-*Miranda* silence had a "substantial and injurious effect" on the jury's verdict. 944 F. 2d, at 1376.

We granted certiorari to resolve a conflict between Courts of Appeals on the question whether the *Chapman* harmless-error standard applies on collateral review of *Doyle* violations, 504 U. S. 972 (1992),[3] and now affirm.

We are the sixth court to pass on the question whether the State's use for impeachment purposes of petitioner's post-*Miranda* silence requires reversal of his murder conviction. Petitioner urges us to even the count, and decide matters in his favor once and for all. He argues that the *Chapman* harmless-error standard applies with equal force on collateral review of *Doyle* error. According to petitioner, the need to prevent state courts from relaxing their standards on direct review of *Doyle* claims, and the confusion which would ensue were we to adopt the *Kotteakos* harmless-error standard on

---

[3] Cf. *Bass* v. *Nix*, 909 F. 2d 297 (CA8 1990) (The *Chapman* harmless-error standard governs in reviewing *Doyle* violations on collateral review).

collateral review, require application of the *Chapman* standard here. Before considering these arguments, however, we must first characterize the nature of *Doyle* error itself.

In *Doyle* v. *Ohio,* 426 U. S., at 619, we held that "the use for impeachment purposes of [a defendant's] silence, at the time of arrest and after receiving *Miranda* warnings, violate[s] the Due Process Clause of the Fourteenth Amendment." This rule "rests on 'the fundamental unfairness of implicitly assuring a suspect that his silence will not be used against him and then using his silence to impeach an explanation subsequently offered at trial.'" *Wainwright* v. *Greenfield,* 474 U. S. 284, 291 (1986) (quoting *South Dakota* v. *Neville,* 459 U. S. 553, 565 (1983)). The "implicit assurance" upon which we have relied in our *Doyle* line of cases is the right-to-remain-silent component of *Miranda.* Thus, the Constitution does not prohibit the use for impeachment purposes of a defendant's silence prior to arrest, *Jenkins* v. *Anderson,* 447 U. S. 231, 239 (1980), or after arrest if no *Miranda* warnings are given, *Fletcher* v. *Weir,* 455 U. S. 603, 606–607 (1982) *(per curiam).* Such silence is probative and does not rest on any implied assurance by law enforcement authorities that it will carry no penalty. See 447 U. S., at 239.

This case illustrates the point well. The first time petitioner claimed that the shooting was an accident was when he took the stand at trial. It was entirely proper—and probative—for the State to impeach his testimony by pointing out that petitioner had failed to tell anyone before the time he received his *Miranda* warnings at his arraignment about the shooting being an accident. Indeed, if the shooting was an accident, petitioner had every reason—including to clear his name and preserve evidence supporting his version of the events—to offer his account immediately following the shooting. On the other hand, the State's references to petitioner's silence after that point in time, or more generally to petitioner's failure to come forward with his version of

events at any time before trial, see n. 2, *supra*, crossed the *Doyle* line. For it is conceivable that, once petitioner had been given his *Miranda* warnings, he decided to stand on his right to remain silent because he believed his silence would not be used against him at trial.

The Court of Appeals characterized *Doyle* as "a prophylactic rule." 944 F. 2d, at 1370. It reasoned that, since the need for *Doyle* stems from the implicit assurance that flows from *Miranda* warnings, and "the warnings required by *Miranda* are not themselves part of the Constitution," "*Doyle* is . . . a prophylactic rule designed to protect another prophylactic rule from erosion or misuse." *Ibid.* But *Doyle* was not simply a further extension of the *Miranda* prophylactic rule. Rather, as we have discussed, it is rooted in fundamental fairness and due process concerns. However real these concerns, *Doyle* does not "'overprotec[t]'" them. *Duckworth* v. *Eagan*, 492 U. S. 195, 209 (1989) (O'CONNOR, J., concurring). Under the rationale of *Doyle*, due process is violated whenever the prosecution uses for impeachment purposes a defendant's post-*Miranda* silence. *Doyle* thus does not bear the hallmarks of a prophylactic rule.

Instead, we think *Doyle* error fits squarely into the category of constitutional violations which we have characterized as "'trial error.'" See *Arizona* v. *Fulminante*, 499 U. S. 279, 307 (1991). Trial error "occur[s] during the presentation of the case to the jury," and is amenable to harmless-error analysis because it "may . . . be quantitatively assessed in the context of other evidence presented in order to determine [the effect it had on the trial]." *Id.*, at 307–308. At the other end of the spectrum of constitutional errors lie "structural defects in the constitution of the trial mechanism, which defy analysis by 'harmless-error' standards." *Id.*, at 309. The existence of such defects—deprivation of the right to counsel,[4] for example—requires automatic reversal of the

---

[4] *Gideon* v. *Wainwright*, 372 U. S. 335 (1963).

conviction because they infect the entire trial process. See *id.*, at 309–310. Since our landmark decision in *Chapman* v. *California*, 386 U. S. 18 (1967), we have applied the harmless-beyond-a-reasonable-doubt standard in reviewing claims of constitutional error of the trial type.

In *Chapman*, we considered whether the prosecution's reference to the defendants' failure to testify at trial, in violation of the Fifth Amendment privilege against self-incrimination,[5] required reversal of their convictions. We rejected the argument that the Constitution requires a blanket rule of automatic reversal in the case of constitutional error, and concluded instead that "there may be some constitutional errors which in the setting of a particular case are so unimportant and insignificant that they may, consistent with the Federal Constitution, be deemed harmless." *Id.*, at 22. After examining existing harmless-error rules, including the federal rule (28 U. S. C. § 2111), we held that "before a federal constitutional error can be held harmless, the court must be able to declare a belief that it was harmless beyond a reasonable doubt." 386 U. S., at 24. The State bears the burden of proving that an error passes muster under this standard.

*Chapman* reached this Court on direct review, as have most of the cases in which we have applied its harmless-error standard. Although we have applied the *Chapman* standard in a handful of federal habeas cases, see, *e. g., Yates* v. *Evatt*, 500 U. S. 391 (1991); *Rose* v. *Clark*, 478 U. S. 570 (1986); *Milton* v. *Wainwright*, 407 U. S. 371 (1972); *Anderson* v. *Nelson*, 390 U. S. 523 (1968) *(per curiam)*, we have yet squarely to address its applicability on collateral review.[6]

---

[5] *Griffin* v. *California*, 380 U. S. 609 (1965).

[6] In *Greer* v. *Miller*, 483 U. S. 756 (1987), we granted certiorari to consider the same question presented here but did not reach this question because we concluded that no *Doyle* error had occurred in that case. See 483 U. S., at 761, n. 3, 765. But see *id.*, at 768 (STEVENS, J., concurring in judgment) ("I believe the question presented in the certiorari petition—

Petitioner contends that we are bound by these habeas cases, by way of *stare decisis,* from holding that the *Kotteakos* harmless-error standard applies on habeas review of *Doyle* error. But since we have never squarely addressed the issue, and have at most assumed the applicability of the *Chapman* standard on habeas, we are free to address the issue on the merits. See *Edelman* v. *Jordan,* 415 U. S. 651, 670–671 (1974).

The federal habeas corpus statute is silent on this point. It permits federal courts to entertain a habeas petition on behalf of a state prisoner "only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States," 28 U. S. C. § 2254(a), and directs simply that the court "dispose of the matter as law and justice require," § 2243. The statute says nothing about the standard for harmless-error review in habeas cases. Respondent urges us to fill this gap with the *Kotteakos* standard, under which an error requires reversal only if it "had substantial and injurious effect or influence in determining the jury's verdict." *Kotteakos* v. *United States,* 328 U. S., at 776. This standard is grounded in the federal harmless-error statute. 28 U. S. C. § 2111 ("On the hearing of any appeal or writ of certiorari in any case, the court shall give judgment after an examination of the record without regard to errors or defects which do not affect the substantial rights of the parties").[7] On its face § 2111 might seem to address the situ-

whether a federal court should apply a different standard in reviewing *Doyle* errors *in a habeas corpus action*—should be answered in the affirmative") (emphasis in original).

[7] In *Kotteakos,* we construed § 2111's statutory predecessor, 28 U. S. C. § 391 (1925–1926 ed.). Section 391 provided: "On the hearing of any appeal, certiorari, writ of error, or motion for a new trial, in any case, civil or criminal, the court shall give judgment after an examination of the entire record before the court, without regard to technical errors, defects, or exceptions which do not affect the substantial rights of the parties." In formulating § 391's harmless-error standard, we focused on the phrase "affect the substantial rights of the parties," and held

ation at hand, but to date we have limited its application to claims of nonconstitutional error in federal criminal cases. See, *e. g., United States* v. *Lane,* 474 U. S. 438 (1986).

Petitioner asserts that Congress' failure to enact various proposals since *Chapman* was decided that would have limited the availability of habeas relief amounts to legislative disapproval of application of a less stringent harmless-error standard on collateral review of constitutional error. Only one of these proposals merits discussion here. In 1972, a bill was proposed that would have amended 28 U. S. C. § 2254 to require habeas petitioners to show that " 'a different result would probably have obtained if such constitutional violation had not occurred.' " 118 Cong. Rec. 24936 (1972) (quoting S. 3833, 92d Cong., 2d Sess. (1972)). In response, the Attorney General suggested that the above provision be modified to make habeas relief available only where the petitioner " 'suffered a substantial deprivation of his constitutional rights at his trial.' " 118 Cong. Rec. 24939 (1972) (quoting letter from Richard G. Kleindienst, Attorney General, to Emanuel Celler, Chairman of the House Committee on the Judiciary (June 21, 1972)). This language of course parallels the federal harmless-error rule. But neither the Attorney General's suggestion nor the proposed bill itself was ever enacted into law.

As a general matter, we are "reluctant to draw inferences from Congress' failure to act." *Schneidewind* v. *ANR Pipeline Co.,* 485 U. S. 293, 306 (1988) (citing *American Trucking Assns., Inc.* v. *Atchison, T. & S. F. R. Co.,* 387 U. S. 397,

---

that the test was whether the error "had substantial and injurious effect or influence in determining the jury's verdict." 328 U. S., at 776. Although Congress tinkered with the language of § 391 when it enacted § 2111 in its place in 1949, Congress left untouched the phrase "affect the substantial rights of the parties." Thus, the enactment of § 2111 did not alter the basis for the harmless-error standard announced in *Kotteakos.* If anything, Congress' deletion of the word "technical," makes § 2111 more amenable to harmless-error review of constitutional violations. Cf. *United States* v. *Hasting,* 461 U. S. 499, 509–510, n. 7 (1983).

416–418 (1967)); *Red Lion Broadcasting Co.* v. *FCC,* 395 U. S. 367, 381, n. 11 (1969)). We find no reason to depart from this rule here. In the absence of any express statutory guidance from Congress, it remains for this Court to determine what harmless-error standard applies on collateral review of petitioner's *Doyle* claim. We have filled the gaps of the habeas corpus statute with respect to other matters, see, *e. g., McCleskey* v. *Zant,* 499 U. S. 467, 487 (1991); *Wainwright* v. *Sykes,* 433 U. S. 72, 81 (1977); *Sanders* v. *United States,* 373 U. S. 1, 15 (1963); *Townsend* v. *Sain,* 372 U. S. 293, 312–313 (1963), and find it necessary to do so here. As always, in defining the scope of the writ, we look first to the considerations underlying our habeas jurisprudence, and then determine whether the proposed rule would advance or inhibit these considerations by weighing the marginal costs and benefits of its application on collateral review.

The principle that collateral review is different from direct review resounds throughout our habeas jurisprudence. See, *e. g., Wright* v. *West,* 505 U. S. 277, 292–293 (1992) (opinion of THOMAS, J.); *Teague* v. *Lane,* 489 U. S. 288, 306 (1989) (opinion of O'CONNOR, J.); *Pennsylvania* v. *Finley,* 481 U. S. 551, 556–557 (1987); *Mackey* v. *United States,* 401 U. S. 667, 682 (1971) (Harlan, J., concurring in judgments in part and dissenting in part). Direct review is the principal avenue for challenging a conviction. "When the process of direct review— which, if a federal question is involved, includes the right to petition this Court for a writ of certiorari—comes to an end, a presumption of finality and legality attaches to the conviction and sentence. The role of federal habeas proceedings, while important in assuring that constitutional rights are observed, is secondary and limited. Federal courts are not forums in which to relitigate state trials." *Barefoot* v. *Estelle,* 463 U. S. 880, 887 (1983).

In keeping with this distinction, the writ of habeas corpus has historically been regarded as an extraordinary remedy, "a bulwark against convictions that violate 'fundamental fair-

ness.'" *Engle* v. *Isaac,* 456 U. S. 107, 126 (1982) (quoting *Wainwright* v. *Sykes, supra,* at 97 (STEVENS, J., concurring)). "Those few who are ultimately successful [in obtaining habeas relief] are persons whom society has grievously wronged and for whom belated liberation is little enough compensation." *Fay* v. *Noia,* 372 U. S. 391, 440–441 (1963). See also *Kuhlmann* v. *Wilson,* 477 U. S. 436, 447 (1986) (plurality opinion) ("The Court uniformly has been guided by the proposition that the writ should be available to afford relief to those 'persons whom society has grievously wronged' in light of modern concepts of justice") (quoting *Fay* v. *Noia, supra,* at 440–441); *Jackson* v. *Virginia,* 443 U. S. 307, 332, n. 5 (1979) (STEVENS, J., concurring in judgment) (Habeas corpus "is designed to guard against extreme malfunctions in the state criminal justice systems"). Accordingly, it hardly bears repeating that "'an error that may justify reversal on direct appeal will not necessarily support a collateral attack on a final judgment.'" *United States* v. *Frady,* 456 U. S. 152, 165 (1982) (quoting *United States* v. *Addonizio,* 442 U. S. 178, 184 (1979)).[8]

Recognizing the distinction between direct and collateral review, we have applied different standards on habeas than would be applied on direct review with respect to matters other than harmless-error analysis. Our recent retroactivity jurisprudence is a prime example. Although new rules always have retroactive application to criminal cases on direct review, *Griffith* v. *Kentucky,* 479 U. S. 314, 320–328 (1987), we have held that they seldom have retroactive application to criminal cases on federal habeas, *Teague* v. *Lane, supra,* at 305–310 (opinion of O'CONNOR, J.). Other examples abound throughout our habeas cases. See, *e. g., Pennsylvania* v.

---

[8] For instance, we have held that an error of law does not provide a basis for habeas relief under 28 U. S. C. § 2255 unless it constitutes "'a fundamental defect which inherently results in a complete miscarriage of justice.'" *United States* v. *Timmreck,* 441 U. S. 780, 783 (1979) (quoting *Hill* v. *United States,* 368 U. S. 424, 428 (1962)).

*Finley*, 481 U. S. 551, 555–556 (1987) (Although the Constitution guarantees the right to counsel on direct appeal, *Douglas* v. *California*, 372 U. S. 353, 355 (1963), there is no "right to counsel when mounting collateral attacks"); *United States* v. *Frady, supra,* at 162–169 (While the federal "plain error" rule applies in determining whether a defendant may raise a claim for the first time on direct appeal, the "cause and prejudice" standard applies in determining whether that same claim may be raised on habeas); *Stone* v. *Powell,* 428 U. S. 465, 489–496 (1976) (Claims under *Mapp* v. *Ohio,* 367 U. S. 643 (1961), are not cognizable on habeas as long as the state courts have provided a full and fair opportunity to litigate them at trial or on direct review).

The reason most frequently advanced in our cases for distinguishing between direct and collateral review is the State's interest in the finality of convictions that have survived direct review within the state court system. See, *e. g., Wright* v. *West, supra,* at 293 (opinion of THOMAS, J.); *McCleskey* v. *Zant,* 499 U. S., at 491; *Wainwright* v. *Sykes,* 433 U. S., at 90. We have also spoken of comity and federalism. "The States possess primary authority for defining and enforcing the criminal law. In criminal trials they also hold the initial responsibility for vindicating constitutional rights. Federal intrusions into state criminal trials frustrate both the States' sovereign power to punish offenders and their good-faith attempts to honor constitutional rights." *Engle* v. *Isaac, supra,* at 128. See also *Coleman* v. *Thompson,* 501 U. S. 722, 748 (1991); *McCleskey, supra,* at 491. Finally, we have recognized that "[l]iberal allowance of the writ . . . degrades the prominence of the trial itself," *Engle, supra,* at 127, and at the same time encourages habeas petitioners to relitigate their claims on collateral review, see *Rose* v. *Lundy,* 455 U. S. 509, 547 (1982) (STEVENS, J., dissenting).

In light of these considerations, we must decide whether the same harmless-error standard that the state courts ap-

plied on direct review of petitioner's *Doyle* claim also applies in this habeas proceeding. We are the sixth court to pass on the question whether the State's use for impeachment purposes of petitioner's post-*Miranda* silence in this case requires reversal of his conviction. Each court that has reviewed the record has disagreed with the court before it as to whether the State's *Doyle* error was "harmless." State courts are fully qualified to identify constitutional error and evaluate its prejudicial effect on the trial process under *Chapman*, and state courts often occupy a superior vantage point from which to evaluate the effect of trial error. See *Rushen* v. *Spain*, 464 U. S. 114, 120 (1983) *(per curiam)*. For these reasons, it scarcely seems logical to require federal habeas courts to engage in the identical approach to harmless-error review that *Chapman* requires state courts to engage in on direct review.

Petitioner argues that application of the *Chapman* harmless-error standard on collateral review is necessary to deter state courts from relaxing their own guard in reviewing constitutional error and to discourage prosecutors from committing error in the first place. Absent affirmative evidence that state-court judges are ignoring their oath, we discount petitioner's argument that courts will respond to our ruling by violating their Article VI duty to uphold the Constitution. See *Robb* v. *Connolly*, 111 U. S. 624, 637 (1884). Federalism, comity, and the constitutional obligation of state and federal courts all counsel against any presumption that a decision of this Court will "deter" lower federal or state courts from fully performing their sworn duty. See *Engle, supra*, at 128; *Schneckloth* v. *Bustamonte*, 412 U. S. 218, 263–265 (1973) (Powell, J., concurring). In any event, we think the costs of applying the *Chapman* standard on federal habeas outweigh the additional deterrent effect, if any, that would be derived from its application on collateral review.

Overturning final and presumptively correct convictions on collateral review because the State cannot prove that an error is harmless under *Chapman* undermines the States' interest in finality and infringes upon their sovereignty over criminal matters. Moreover, granting habeas relief merely because there is a "'reasonable possibility'" that trial error contributed to the verdict, see *Chapman* v. *California*, 386 U. S., at 24 (quoting *Fahy* v. *Connecticut*, 375 U. S. 85, 86 (1963)), is at odds with the historic meaning of habeas corpus—to afford relief to those whom society has "grievously wronged." Retrying defendants whose convictions are set aside also imposes significant "social costs," including the expenditure of additional time and resources for all the parties involved, the "erosion of memory" and "dispersion of witnesses" that accompany the passage of time and make obtaining convictions on retrial more difficult, and the frustration of "society's interest in the prompt administration of justice." *United States* v. *Mechanik*, 475 U. S. 66, 72 (1986) (internal quotation marks omitted). And since there is no statute of limitations governing federal habeas, and the only laches recognized is that which affects the State's ability to defend against the claims raised on habeas, retrials following the grant of habeas relief ordinarily take place much later than do retrials following reversal on direct review.

The imbalance of the costs and benefits of applying the *Chapman* harmless-error standard on collateral review counsels in favor of applying a less onerous standard on habeas review of constitutional error. The *Kotteakos* standard, we believe, fills the bill. The test under *Kotteakos* is whether the error "had substantial and injurious effect or influence in determining the jury's verdict." 328 U. S., at 776. Under this standard, habeas petitioners may obtain plenary review of their constitutional claims, but they are not entitled to habeas relief based on trial error unless they can establish that it resulted in "actual prejudice." See *United States* v. *Lane*, 474 U. S. 438, 449 (1986). The *Kotteakos*

standard is thus better tailored to the nature and purpose of collateral review and more likely to promote the considerations underlying our recent habeas cases. Moreover, because the *Kotteakos* standard is grounded in the federal harmless-error rule, 28 U. S. C. §2111, federal courts may turn to an existing body of case law in applying it. Therefore, contrary to the assertion of petitioner, application of the *Kotteakos* standard on collateral review is unlikely to confuse matters for habeas courts.

For the foregoing reasons, then, we hold that the *Kotteakos* harmless-error standard applies in determining whether habeas relief must be granted because of constitutional error of the trial type.[9] All that remains to be decided is whether petitioner is entitled to relief under this standard based on the State's *Doyle* error. Because the Court of Appeals applied the *Kotteakos* standard below, we proceed to this question ourselves rather than remand the case for a new harmless-error determination. Cf. *Yates* v. *Evatt*, 500 U. S. 391, 407 (1991). At trial, petitioner admitted shooting Hartman, but claimed it was an accident. The principal question before the jury, therefore, was whether the State met its burden in proving beyond a reasonable doubt that the shooting was intentional. Our inquiry here is whether, in light of the record as a whole, the State's improper use for impeachment purposes of petitioner's post-*Miranda* silence, see n. 2, *supra*, "had substantial and injurious effect or influence in determining the jury's verdict." We think it clear that it did not.

---

[9] Our holding does not foreclose the possibility that in an unusual case, a deliberate and especially egregious error of the trial type, or one that is combined with a pattern of prosecutorial misconduct, might so infect the integrity of the proceeding as to warrant the grant of habeas relief, even if it did not substantially influence the jury's verdict. Cf. *Greer* v. *Miller*, 483 U. S. 756, 769 (1987) (STEVENS, J., concurring in judgment). We, of course, are not presented with such a situation here.

The State's references to petitioner's post-*Miranda* silence were infrequent, comprising less than two pages of the 900-page trial transcript in this case. And in view of the State's extensive and permissible references to petitioner's pre-*Miranda* silence—i. e., his failure to mention anything about the shooting being an accident to the officer who found him in the ditch, the man who gave him a ride to Winona, or the officers who eventually arrested him—its references to petitioner's post-*Miranda* silence were, in effect, cumulative. Moreover, the State's evidence of guilt was, if not overwhelming, certainly weighty. The path of the bullet through Mr. Hartman's body was inconsistent with petitioner's testimony that the rifle had discharged as he was falling. The police officers who searched the Hartmans' home found nothing in the downstairs hallway that could have caused petitioner to trip. The rifle was found outside the house (where Hartman was shot), not inside where petitioner claimed it had accidently fired, and there was a live round rammed in the gun's chamber, suggesting that petitioner had tried to fire a second shot. Finally, other circumstantial evidence, including the motive proffered by the State, also pointed to petitioner's guilt.

In light of the foregoing, we conclude that the *Doyle* error that occurred at petitioner's trial did not "substantial[ly] . . . influence" the jury's verdict. Petitioner is therefore not entitled to habeas relief, and the judgment of the Court of Appeals is

*Affirmed.*

JUSTICE STEVENS, concurring.

The Fourteenth Amendment prohibits the deprivation of liberty "without due process of law"; that guarantee is the source of the federal right to challenge state criminal convictions that result from fundamentally unfair trial proceedings. Neither the term "due process," nor the concept of fundamental unfairness itself, is susceptible of precise and categor-

ical definition, and no single test can guarantee that a judge will grant or deny habeas relief when faced with a similar set of facts. Every allegation of due process denied depends on the specific process provided, and it is familiar learning that all "claims of constitutional error are not fungible." *Rose* v. *Lundy*, 455 U. S. 509, 543 (1982) (STEVENS, J., dissenting). As the Court correctly notes, constitutional due process violations vary dramatically in significance; harmless trial errors are at one end of a broad spectrum, and what the Court has characterized as "structural" defects—those that make a trial fundamentally unfair even if they do not affect the outcome of the proceeding—are at "the other end of the spectrum," *ante*, at 629. Although Members of the Court have disagreed about the seriousness of the due process violation identified in *Doyle* v. *Ohio*, 426 U. S. 610 (1976), in this case we unanimously agree that a constitutional violation occurred; moreover, we also all agree that some version of harmless-error analysis is appropriate.

We disagree, however, about whether the same form of harmless-error analysis should apply in a collateral attack as on a direct appeal, and, if not, what the collateral attack standard should be for an error of this kind. The answer to the first question follows from our long history of distinguishing between collateral and direct review, see, *e. g.*, *Sunal* v. *Large*, 332 U. S. 174, 178 (1947), and confining collateral relief to cases that involve fundamental defects or omissions inconsistent with the rudimentary demands of fair procedure, see, *e. g.*, *United States* v. *Timmreck*, 441 U. S. 780, 783 (1979), and cases cited therein. The Court answers the second question by endorsing Justice Rutledge's thoughtful opinion for the Court in *Kotteakos* v. *United States*, 328 U. S. 750 (1946). *Ante*, at 623, 638. Because that standard accords with the statutory rule for reviewing other trial errors that affect substantial rights; places the burden on prosecutors to explain why those errors were harmless; requires a habeas court to review the entire record *de novo* in determining

whether the error influenced the jury's deliberations; and leaves considerable latitude for the exercise of judgment by federal courts, I am convinced that our answer is correct. I write separately only to emphasize that the standard is appropriately demanding.

As the Court notes, *ante*, at 631–632, n. 7, the *Kotteakos* standard is grounded in the 1919 federal harmless-error statute. Congress had responded to the widespread concern that federal appellate courts had become "impregnable citadels of technicality," *Kotteakos*, 328 U. S., at 759, by issuing a general command to treat error as harmless unless it "is of such a character that its natural effect is to prejudice a litigant's substantial rights," *id.*, at 760–761. *Kotteakos* plainly stated that unless an error is merely "technical," the burden of sustaining a verdict by demonstrating that the error was harmless rests on the prosecution.[1] A constitutional violation, of course, would never fall in the "technical" category.

Of particular importance, the statutory command requires the reviewing court to evaluate the error in the context of the entire trial record. As the Court explained: "In the final analysis judgment in each case must be influenced by conviction resulting from examination of the proceedings in their entirety, tempered but not governed in any rigid sense of

---

[1] "It is also important to note that the purpose of the bill in its final form was stated authoritatively to be 'to cast upon the party seeking a new trial the burden of showing that any technical errors that he may complain of have affected his substantial rights, otherwise they are to be disregarded.' H. R. Rep. No. 913, 65th Cong., 3d Sess., 1. But that this burden does not extend to all errors appears from the statement which follows immediately. 'The proposed legislation affects only technical errors. If the error is of such a character that its natural effect is to prejudice a litigant's substantial rights, the burden of sustaining a verdict will, notwithstanding this legislation rest upon the one who claims under it.' *Ibid.*; *Bruno* v. *United States*, [308 U. S. 287, 294 (1939)]; *Weiler* v. *United States*, 323 U. S. 606, 611 [(1945)]." *Kotteakos* v. *United States*, 328 U. S., at 760–761.

*stare decisis* by what has been done in similar situations."
*Id.*, at 762.

To apply the *Kotteakos* standard properly, the reviewing
court must, therefore, make a *de novo* examination of the
trial record. The Court faithfully engages in such *de novo*
review today, see *ante*, at 638–639, just as the plurality did
in the dispositive portion of its analysis in *Wright* v. *West*,
505 U. S. 277, 295–297 (1992) (opinion of THOMAS, J.). The
*Kotteakos* requirement of *de novo* review of errors that prej-
udice substantial rights—as all constitutional errors surely
do—is thus entirely consistent with the Court's longstanding
commitment to the *de novo* standard of review of mixed
questions of law and fact in habeas corpus proceedings. See
*Wright* v. *West*, 505 U. S., at 299–303 (O'CONNOR, J., concur-
ring in judgment).

The purpose of reviewing the entire record is, of course,
to consider all the ways that error can infect the course of
a trial. Although THE CHIEF JUSTICE properly quotes the
phrase applied to the errors in *Kotteakos* ("'substantial and
injurious effect or influence in determining the jury's ver-
dict'"), *ante*, at 623, 627, 637, 639, we would misread *Kot-
teakos* itself if we endorsed only a single-minded focus on
how the error may (or may not) have affected the jury's ver-
dict. The habeas court cannot ask only whether it thinks
the petitioner would have been convicted even if the consti-
tutional error had not taken place.[2] *Kotteakos* is full of
warnings to avoid that result. It requires a reviewing court
to decide that "the error did not influence the jury," 328
U. S., at 764, and that "the judgment was not substantially
swayed by the error," *id.*, at 765. In a passage that should
be kept in mind by all courts that review trial transcripts,
Justice Rutledge wrote that the question is *not*

"were they [the jurors] right in their judgment, regard-
less of the error or its effect upon the verdict. It is

---

[2] "The inquiry cannot be merely whether there was enough to support
the result, apart from the phase affected by the error." *Id.*, at 765.

rather what effect the error had or reasonably may be taken to have had upon the jury's decision. The crucial thing is the impact of the thing done wrong on the minds of other men, not on one's own, in the total setting.

"This must take account of what the error meant to them, not singled out and standing alone, but in relation to all else that happened. And one must judge others' reactions not by his own, but with allowance for how others might react and not be regarded generally as acting without reason. This is the important difference, but one easy to ignore when the sense of guilt comes strongly from the record." *Id.*, at 764 (citations omitted).

The *Kotteakos* standard that will now apply on collateral review is less stringent than the *Chapman* v. *California*, 386 U. S. 18 (1967), standard applied on direct review. Given the critical importance of the faculty of judgment in administering either standard, however, that difference is less significant than it might seem—a point well illustrated by the differing opinions expressed by THE CHIEF JUSTICE and by JUSTICE KENNEDY in *Arizona* v. *Fulminante*, 499 U. S. 279, 302, 313 (1991). While THE CHIEF JUSTICE considered the admission of the defendant's confession harmless error under *Chapman*, see 499 U. S., at 312 (dissenting opinion), JUSTICE KENNEDY's cogent analysis demonstrated that the error could not reasonably have been viewed as harmless under a standard even more relaxed than the one we announce today, see *id.*, at 313–314 (opinion concurring in judgment). In the end, the way we phrase the governing standard is far less important than the quality of the judgment with which it is applied.

Although our adoption of *Kotteakos* does impose a new standard in this context, it is a standard that will always require "the discrimination . . . of judgment transcending confinement by formula or precise rule. *United States* v.

*Socony-Vacuum Oil Co.,* 310 U. S. 150, 240 [(1940)]." 328 U. S., at 761.[3] In my own judgment, for the reasons explained by THE CHIEF JUSTICE, the *Doyle* error that took place in petitioner's trial did not have a substantial and injurious effect or influence in determining the jury's verdict. Accordingly, I concur in the Court's opinion and judgment.

JUSTICE WHITE, with whom JUSTICE BLACKMUN joins, and with whom JUSTICE SOUTER joins in part, dissenting.

Assuming that petitioner's conviction was in fact tainted by a constitutional violation that, while not harmless beyond a reasonable doubt, did not have "substantial and injurious effect or influence in determining the jury's verdict," *Kotteakos* v. *United States,* 328 U. S. 750, 776 (1946), it is undisputed that he would be entitled to reversal in the state courts on appeal or in this Court on certiorari review. If, however, the state courts erroneously concluded that no violation had occurred or (as is the case here) that it was harmless beyond a reasonable doubt, and supposing further that certiorari was either not sought or not granted, the majority would foreclose relief on federal habeas review. As a result of today's decision, in short, the fate of one in state custody turns on whether the state courts properly applied the Federal Constitution as then interpreted by decisions of this Court, and on whether we choose to review his claim on certiorari. Because neither the federal habeas corpus statute nor our own precedents can support such illogically disparate treatment, I dissent.

---

[3] Justice Rutledge continued: "That faculty cannot ever be wholly imprisoned in words, much less upon such a criterion as what are only technical, what substantial rights; and what really affects the latter hurtfully. Judgment, the play of impression and conviction along with intelligence, varies with judges and also with circumstance. What may be technical for one is substantial for another; what minor and unimportant in one setting crucial in another." *Id.,* at 761.

I

A

*Chapman* v. *California*, 386 U. S. 18 (1967), established the federal nature of the harmless-error standard to be applied when constitutional rights are at stake. Such rights, we stated, are "rooted in the Bill of Rights, offered and championed in the Congress by James Madison, who told the Congress that the 'independent' federal courts would be the 'guardians of those rights.'" *Id.*, at 21 (footnote omitted). Thus,

> "[w]hether a conviction for crime should stand when a State has failed to accord federal constitutionally guaranteed rights is *every bit as much of a federal question as what particular federal constitutional provisions themselves mean, what they guarantee, and whether they have been denied.* With faithfulness to the constitutional union of the States, we cannot leave to the States the formulation of the authoritative laws, rules, and remedies designed to protect people from infractions by the States of federally guaranteed rights." *Ibid.* (emphasis added).

*Chapman*, it is true, never expressly identified the source of this harmless-error standard. But, whether the standard be characterized as a "necessary rule" of federal law, *ibid.*, or criticized as a quasi-constitutional doctrine, see *id.*, at 46, 51 (Harlan, J., dissenting), the Court clearly viewed it as essential to the safeguard of federal constitutional rights. Otherwise, there would have been no justification for imposing the rule on state courts. Cf. *id.*, at 48–51 (Harlan, J., dissenting). As far as I can tell, the majority does not question *Chapman*'s vitality on direct review and, therefore, the federal and constitutional underpinnings on which it rests.

That being so, the majority's conclusion is untenable. Under *Chapman*, federal law requires reversal of a state

conviction involving a constitutional violation that is not harmless beyond a reasonable doubt. A defendant whose conviction has been upheld despite the occurrence of such a violation certainly is "in custody in violation of the Constitution or laws . . . of the United States," 28 U. S. C. § 2254(a), and therefore is entitled to habeas relief. Although we have never explicitly held that this was the case, our practice before this day plainly supports this view, as the majority itself acknowledges. See, e. g., Rose v. Clark, 478 U. S. 570, 584 (1986); see also ante, at 630.

B

The Court justifies its decision by asserting that "collateral review is different from direct review," ante, at 633, and that "we have applied different standards on habeas than would be applied on direct review with respect to matters other than harmless-error analysis," ante, at 634. All told, however, it can only uncover a single example of a constitutional violation that would entitle a state prisoner to relief on direct, but not on collateral, review. Thus, federal habeas review is not available to a defendant claiming that the conviction rests on evidence seized in violation of the Fourth Amendment, even though such claims remain cognizable in state courts. Stone v. Powell, 428 U. S. 465 (1976). I have elsewhere stated my reasons for disagreeing with that holding, id., at 536–537 (WHITE, J., dissenting), but today's decision cannot be supported even under Stone's own terms.

Stone was premised on the view that the exclusionary rule is not a "personal constitutional right," id., at 486, and that it "does not exist to remedy any wrong committed against the defendant, but rather to deter violations of the Fourth Amendment by law enforcement personnel," Kimmelman v. Morrison, 477 U. S. 365, 392 (1986) (Powell, J., concurring in judgment). In other words, one whose conviction rests on evidence obtained in a search or seizure that violated the Fourth Amendment is deemed not to be unconstitutionally

detained. It is no surprise, then, that the Court of Appeals in this case rested its decision on an analogy between the rights guaranteed in *Doyle* v. *Ohio*, 426 U. S. 610 (1976), and those at issue in *Stone.* See 944 F. 2d 1363, 1371–1372 (CA7 1991). *Doyle*, it concluded, "is . . . a prophylactic rule designed to protect another prophylactic rule from erosion or misuse." 944 F. 2d, at 1370.

But the Court clearly and, in my view, properly rejects that view. Indeed, it repeatedly emphasizes that *Doyle* "is rooted in fundamental fairness and due process concerns," that "due process is violated whenever the prosecution uses for impeachment purposes a defendant's post-*Miranda* silence," and that it "does not bear the hallmarks of a prophylactic rule." *Ante*, at 629. Because the Court likewise leaves undisturbed the notion that *Chapman*'s harmless-error standard is required to protect constitutional rights, see *supra*, at 645, its conclusion that a *Doyle* violation that fails to meet that standard will not trigger federal habeas relief is inexplicable.

## II

The majority's decision to adopt this novel approach is far from inconsequential. Under *Chapman*, the State must prove beyond a reasonable doubt that the constitutional error "did not contribute to the verdict obtained." 386 U. S., at 24. In contrast, the Court now invokes *Kotteakos* v. *United States*, 328 U. S. 750 (1946)—a case involving a non-constitutional error of trial procedure—to impose on the defendant the burden of establishing that the error "resulted in 'actual prejudice.'" *Ante*, at 637. Moreover, although the Court of Appeals limited its holding to *Doyle* and other so-called "prophylactic" rules, 944 F. 2d, at 1375, and although the parties' arguments were similarly focused, see Brief for Respondent 36–37; Brief for United States as *Amicus Curiae* 16, 19, n. 11, the Court extends its holding to all "constitutional error[s] of the trial type," *ante*, at 638. Given that

all such "trial errors" are now subject to harmless-error analysis, see *Arizona* v. *Fulminante*, 499 U. S. 279, 307–308 (1991), and that "most constitutional errors" are of this variety, *id.*, at 306, the Court effectively has ousted *Chapman* from habeas review of state convictions.* In other words, a state court determination that a constitutional error—even one as fundamental as the admission of a coerced confession, see *Fulminante, supra,* at 308—is harmless beyond a reasonable doubt has in effect become unreviewable by lower federal courts by way of habeas corpus.

I believe this result to be at odds with the role Congress has ascribed to habeas review, which is, at least in part, to deter both prosecutors and courts from disregarding their constitutional responsibilities. "[T]he threat of habeas serves as a necessary additional incentive for trial and appellate courts throughout the land to conduct their proceedings in a manner consistent with established constitutional standards." *Desist* v. *United States*, 394 U. S. 244, 262–263 (1969) (Harlan, J., dissenting); see also *Teague* v. *Lane*, 489 U. S. 288, 306 (1989) (plurality opinion). In response, the majority characterizes review of the *Chapman* determination by a federal habeas court as "scarcely . . . logical," *ante*, at 636, and, in any event, sees no evidence that deterrence is needed. *Ibid.* Yet the logic of such practice is not ours to assess for, as Justice Frankfurter explained:

> "Congress could have left the enforcement of federal constitutional rights governing the administration of criminal justice in the States exclusively to the State courts. These tribunals are under the same duty as the federal courts to respect rights under the United States Constitution. . . . But the wisdom of such a modification in the law is for Congress to consider . . . ." *Brown* v.

---

*As I explained in *Fulminante*, I have serious doubt regarding the effort to classify in systematic fashion constitutional violations as either "trial errors"—that are subject to harmlessness analysis—or "structural defects"—that are not. See 499 U. S., at 290 (WHITE, J., dissenting).

*Allen,* 344 U. S. 443, 499–500 (1953) (opinion of Frank-furter, J.).

"[T]he prior State determination of a claim under the United States Constitution cannot foreclose consider-ation of such a claim, else the State court would have the final say which the Congress . . . provided it should not have." *Id.,* at 500.

See also *Reed* v. *Ross,* 468 U. S. 1, 10 (1984). As for the "empirical evidence" the majority apparently seeks, I cannot understand its import. Either state courts are faithful to federal law, in which case there is no cost in applying the *Chapman* as opposed to the *Kotteakos* standard on collateral review; or they are not, and it is precisely the role of habeas corpus to rectify that situation.

Ultimately, the central question is whether States may de-tain someone whose conviction was tarnished by a constitu-tional violation that is not harmless beyond a reasonable doubt. *Chapman* dictates that they may not; the majority suggests that, so long as direct review has not corrected this error in time, they may. If state courts remain obliged to apply *Chapman,* and in light of the infrequency with which we grant certiorari, I fail to see how this decision can be reconciled with Congress' intent.

### III

Our habeas jurisprudence is taking on the appearance of a confused patchwork in which different constitutional rights are treated according to their status, and in which the same constitutional right is treated differently depending on whether its vindication is sought on direct or collateral re-view. I believe this picture bears scant resemblance either to Congress' design or to our own precedents. The Court of Appeals having yet to apply *Chapman* to the facts of this case, I would remand to that court for determination of whether the *Doyle* violation was harmless beyond a reason-able doubt. I dissent.

JUSTICE BLACKMUN, dissenting.

I agree that "today's decision cannot be supported even under *Stone*'s own terms," *ante*, at 646 (WHITE, J., dissenting). Therefore, I join JUSTICE WHITE's dissent in its entirety.

JUSTICE O'CONNOR, dissenting.

I have no dispute with the Court's observation that "collateral review is different from direct review." *Ante*, at 633. Just as the federal courts may decline to adjudicate certain issues of federal law on habeas because of prudential concerns, see *Withrow* v. *Williams, post*, at 686; *post*, at 699–700 (O'CONNOR, J., concurring in part and dissenting in part), so too may they resolve specific claims on habeas using different and more lenient standards than those applicable on direct review, see, *e. g., Teague* v. *Lane*, 489 U. S. 288, 299–310 (1989) (habeas claims adjudicated under the law prevailing at time conviction became final and not on the basis of intervening changes of law). But decisions concerning the Great Writ "warrant restraint," *Withrow, post*, at 700 (O'CONNOR, J., concurring in part and dissenting in part), for we ought not take lightly alteration of that "'fundamental safeguard against unlawful custody,'" *post*, at 697–698 (quoting *Fay* v. *Noia*, 372 U. S. 391, 449 (1963) (Harlan, J., dissenting)).

In my view, restraint should control our decision today. The issue before us is not whether we should remove from the cognizance of the federal courts on habeas a discrete prophylactic rule unrelated to the truthfinding function of trial, as was the case in *Stone* v. *Powell*, 428 U. S. 465 (1976), and more recently in *Withrow* v. *Williams, post*, p. 680. Rather, we are asked to alter a standard that not only finds application in virtually every case of error but that also may be critical to our faith in the reliability of the criminal process. Because I am not convinced that the principles governing the exercise of our habeas powers—federalism, finality, and fairness—counsel against applying *Chapman*'s harmless-error standard on collateral review, I would adhere to our

former practice of applying it to cases on habeas and direct review alike. See *ante,* at 630. I therefore respectfully dissent.

The Court begins its analysis with the nature of the constitutional violation asserted, *ante,* at 628–630, and appropriately so. We long have recognized that the exercise of the federal courts' habeas powers is governed by equitable principles. *Fay* v. *Noia, supra,* at 438; *Withrow, post,* at 699–700 (O'CONNOR, J., concurring in part and dissenting in part). And the nature of the right at issue is an important equitable consideration. When a prisoner asserts the violation of a core constitutional privilege critical to the reliability of the criminal process, he has a strong claim that fairness favors review; but if the infringement concerns only a prophylactic rule, divorced from the criminal trial's truthfinding function, the prisoner's claim to the equities rests on far shakier ground. Thus, in *Withrow* v. *Williams,* this Court declined to bar relitigation of *Miranda* claims on habeas because *Miranda* is connected to the Fifth Amendment and the Fifth Amendment, in turn, serves the interests of reliability. *Withrow, post,* at 691–692. I dissented because I believe that *Miranda* is a prophylactic rule that actually impedes the truthseeking function of criminal trials. *Withrow, post,* at 700, 701–708. See also *Stone* v. *Powell, supra,* at 486, 490 (precluding review of exclusionary rule violations in part because the rule is judicially fashioned and interferes with the truthfinding function of trial).

Petitioner in this case alleged a violation of *Doyle* v. *Ohio,* 426 U. S. 610 (1976), an error the Court accurately characterizes as constitutional trial error. *Ante,* at 629–630. But the Court's holding today, it turns out, has nothing to do with *Doyle* error at all. Instead, the Court announces that the harmless-error standard of *Chapman* v. *California,* 386 U. S. 18, 24 (1967), which requires the prosecution to prove constitutional error harmless beyond a reasonable doubt, no longer applies to *any* trial error asserted on habeas, whether it is a

*Doyle* error or not. In *Chapman*'s place, the Court substitutes the less rigorous standard of *Kotteakos* v. *United States*, 328 U. S. 750, 776 (1946). *Ante*, at 638.

A repudiation of the application of *Chapman* to *all* trial errors asserted on habeas should be justified, if at all, based on the nature of the *Chapman* rule itself. Yet, as JUSTICE WHITE observes, *ante*, at 645 (dissenting opinion), one searches the majority opinion in vain for a discussion of the basis for *Chapman*'s harmless-error standard. We are left to speculate whether *Chapman* is the product of constitutional command or a judicial construct that may overprotect constitutional rights. More important, the majority entirely fails to discuss the *effect* of the *Chapman* rule. If there is a unifying theme to this Court's habeas jurisprudence, it is that the ultimate equity on the prisoner's side—the possibility that an error may have caused the conviction of an actually innocent person—is sufficient by itself to permit plenary review of the prisoner's federal claim. *Withrow, post*, at 700 (O'CONNOR, J., concurring in part and dissenting in part) (citing cases). Whatever the source of the *Chapman* standard, the equities may favor its application on habeas if it substantially promotes the central goal of the criminal justice system—accurate determinations of guilt and innocence. See *Withrow, post*, at 705–706 (reasoning that, although *Miranda* may be a prophylactic rule, the fact that it is not "divorced" from the truthfinding function of trial weighs in favor of its application on habeas); *Teague, supra*, at 313 (if absence of procedure seriously diminishes likelihood of accurate conviction, new rule requiring such procedure may be retroactively applied on habeas).

In my view, the harmless-error standard often will be inextricably intertwined with the interest of reliability. By now it goes without saying that harmless-error review is of almost universal application; there are few errors that may not be forgiven as harmless. *Arizona* v. *Fulminante*, 499 U. S. 279, 306–307 (1991). For example, we have recognized

that a defendant's right to confront the witnesses against him is central to the truthfinding function of the criminal trial. See, *e. g., Maryland* v. *Craig,* 497 U. S. 836, 845–847 (1990); *Ohio* v. *Roberts,* 448 U. S. 56, 65 (1980); *Mattox* v. *United States,* 156 U. S. 237, 242–243 (1895); see also 3 W. Blackstone, Commentaries 373–374 (1768). But Confrontation Clause violations are subject to harmless-error review nonetheless. See *Coy* v. *Iowa,* 487 U. S. 1012, 1021–1022 (1988). When such an error is detected, the harmless-error standard is crucial to our faith in the accuracy of the outcome: The absence of full adversary testing, for example, cannot help but erode our confidence in a verdict; a jury easily may be misled by such an omission. Proof of harmlessness beyond a reasonable doubt, however, sufficiently restores confidence in the verdict's reliability that the conviction may stand despite the potentially accuracy impairing error. Such proof demonstrates that, even though the error had the *potential* to induce the jury to err, in fact there is no reasonable possibility that it did. Rather, we are confident beyond a reasonable doubt that the error had no influence on the jury's judgment at all. Cf. *In re Winship,* 397 U. S. 358, 363–364 (1970) (proof of guilt beyond a reasonable doubt indispensable to community's respect and confidence in criminal process).

At least where errors bearing on accuracy are at issue, I am not persuaded that the *Kotteakos* standard offers an adequate assurance of reliability. Under the Court's holding today, federal courts on habeas are barred from offering relief unless the error " 'had substantial and injurious effect or influence in determining the jury's verdict.' " *Ante,* at 637 (quoting *Kotteakos, supra,* at 776). By tolerating a greater probability that an error with the potential to undermine verdict accuracy was harmful, the Court increases the likelihood that a conviction will be preserved despite an error that actually affected the reliability of the trial. Of course, the Constitution does not require that every conceivable precau-

tion in favor of reliability be taken; and certainly 28 U. S. C. § 2254 does not impose such an obligation on its own. Indeed, I agree with the Court that habeas relief under § 2254 is reserved for those prisoners "whom society has 'grievously wronged.'" *Ante,* at 637. But prisoners who may have been convicted mistakenly because of constitutional trial error *have* suffered a grievous wrong and ought not be required to bear the greater risk of uncertainty the Court now imposes upon them. Instead, where constitutional error may have affected the accuracy of the verdict, on habeas we should insist on such proof as will restore our faith in the verdict's accuracy to a reasonable certainty. Adherence to the standard enunciated in *Chapman* requires no more; and the equities require no less.

To be sure, the harmless-error inquiry will not always bear on reliability. If the trial error being reviewed for harmlessness is not itself related to the interest of accuracy, neither is the harmless-error standard. Accordingly, in theory it would be neither illogical nor grudging to reserve *Chapman* for errors related to the accuracy of the verdict, applying *Kotteakos'* more lenient rule whenever the error is of a type that does not impair confidence in the trial's result. But the Court draws no such distinction. On the contrary, it holds *Kotteakos* applicable to *all* trial errors, whether related to reliability or not. The Court does offer a glimmer of hope by reserving in a footnote the possibility of an exception: *Chapman* may remain applicable, it suggests, in some "unusual" cases. But the Court's description of those cases suggests that its potential exception would be both exceedingly narrow and unrelated to reliability concerns. See *ante,* at 638, n. 9 (reserving the "possibility that in an unusual case, a deliberate and especially egregious error of the trial type" or error "combined with a pattern of prosecutorial misconduct, might so infect the integrity of the proceeding as to warrant the grant of habeas relief, even it did not substantially influence the jury's verdict").

But even if the Court's holding were limited to errors divorced from reliability concerns, the decision nevertheless would be unwise from the standpoint of judicial administration. Like JUSTICE WHITE, I do not believe we should turn our habeas jurisprudence into a "patchwork" of rules and exceptions without strong justification. *Ante,* at 649 (dissenting opinion). The interest of efficiency, always relevant to the scope of habeas relief, see, *e. g., Stone,* 428 U. S., at 491, n. 31; *Withrow, post,* at 693–694; *post,* at 708–713 (O'CONNOR, J., concurring in part and dissenting in part), favors simplification of legal inquiries, not their multiplication. A rule requiring the courts to distinguish between errors that affect accuracy and those that do not, however, would open up a whole new frontier for litigation and decision. In each case, the litigants would brief and federal judges would be required to decide whether the particular error asserted relates to accuracy. Given the number of constitutional rules we have recognized and the virtually limitless ways in which they might be transgressed, I cannot imagine that the benefits brought by such litigation could outweigh the costs it would impose.

In fact, even on its own terms the Court's decision buys the federal courts a lot of trouble. From here on out, prisoners undoubtedly will litigate—and judges will be forced to decide—whether each error somehow might be wedged into the narrow potential exception the Court mentions in a footnote today. Moreover, since the Court only mentions the *possibility* of an exception, all concerned must also address whether the exception exists at all. I see little justification for imposing these novel and potentially difficult questions on our already overburdened justice system.

Nor does the majority demonstrate that the *Kotteakos* standard will ease the burden of conducting harmless-error review in those cases to which it does apply. Indeed, as JUSTICE STEVENS demonstrates in his concurrence, *Kotteakos* is unlikely to lighten the load of the federal judiciary at all. The courts still must review the entire record in search of

conceivable ways the error may have influenced the jury;
they still must conduct their review *de novo;* and they still
must decide whether they have sufficient confidence that the
verdict would have remained unchanged even if the error
had not occurred. See *ante,* at 641–642. The only thing the
Court alters today is the degree of confidence that suffices.
But *Kotteakos'* threshold is no more precise than *Chapman's;*
each requires an exercise of judicial judgment that cannot
be captured by the naked words of verbal formulae. *Kot-
teakos,* it is true, is somewhat more lenient; it will permit
more errors to pass uncorrected. But that simply reduces
the number of cases in which relief will be granted. It does
not decrease the burden of identifying those cases that war-
rant relief.

Finally, the majority considers the costs of habeas review
generally. *Ante,* at 637. Once again, I agree that those
costs—the effect on finality, the infringement on state sover-
eignty, and the social cost of requiring retrial, sometimes
years after trial and at a time when a new trial has become
difficult or impossible—are appropriate considerations. See
*Withrow, post,* at 703–704 (O'CONNOR, J., concurring in part
and dissenting in part); see also *post,* at 686–687, 708–709;
*Stone, supra,* at 489–491. But the Court does not explain
how those costs set the harmless-error inquiry apart from
any other question presented on habeas; such costs are inevi-
table *whenever* relief is awarded. Unless we are to accept
the proposition that denying relief whenever possible is an
unalloyed good, the costs the Court identifies cannot by
themselves justify the lowering of standards announced
today. The majority, of course, does not contend otherwise;
instead, it adheres to our traditional approach of distinguish-
ing between those claims that are worthy of habeas relief
and those that, for prudential and equitable reasons, are not.
Nonetheless, it seems to me that the Court's decision cuts
too broadly and deeply to comport with the equitable and
remedial nature of the habeas writ; it is neither justified nor

justifiable from the standpoint of fairness or judicial efficiency. Because I would remand the case to the Court of Appeals for application of *Chapman*'s more demanding harmless-error standard, I respectfully dissent.

JUSTICE SOUTER, dissenting.

I join in all but the footnote and Part III of JUSTICE WHITE's dissent, subject only to the caveat that I do not mean to indicate an opinion on the merits of *Stone* v. *Powell*, 428 U. S. 465 (1976).