NOT RECOMMENDED FOR PUBLICATION
File Name: 16a0040n.06

No. 14-5510

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

FILED
Jan 22, 2016
DEBORAH S. HUNT, Clerk

| | | |
|---|---|---|
| STEVEN CRAIG FULTS, | ) | |
| | ) | |
| Petitioner-Appellant, | ) | |
| | ) | |
| v. | ) | ON APPEAL FROM THE |
| | ) | UNITED STATES DISTRICT |
| ERIC QUALLS, | ) | COURT FOR THE MIDDLE |
| | ) | DISTRICT OF TENNESSEE |
| Respondent-Appellee. | ) | |
| | ) | |
| | ) | |

BEFORE: KEITH, ROGERS, and GRIFFIN, Circuit Judges.

ROGERS, Circuit Judge. Steven Fults appeals the district court's judgment denying habeas relief in this case concerning a possible *Blakely v. Washington* error at Fults' sentencing for five rape convictions. The sentencing court applied four statutory enhancements to increase Fults' sentence for each rape from eight to nine years' incarceration. This resulted in an aggregate sentence of forty-five years. Fults argues that his sentence should be reduced to forty years, the presumptive sentence for five rape convictions. Fults is not entitled to a writ of habeas corpus under 28 U.S.C. § 2254, as the sentencing error, if any, was harmless.

This case arose from events involving a teenage victim and Fults, a middle school teacher. The following facts are taken from the opinion of the Tennessee Court of Criminal Appeals in *State v. Fults*, No. M2004-02092-CCA-R3-CD, 2006 WL 1896356, at *1–3 (Tenn. Crim. App. July 7, 2006) (alterations in original):

The victim in this case, a minor, will be referred to by his initials. M.D. testified that he was born in 1986 and was seventeen years old at the time of the trial. He attended Barfield Elementary School in Rutherford County, where Defendant taught seventh grade social studies. M.D. said his home room was across from Defendant's classroom, and he saw Defendant every day around the school. Defendant let the students, including M.D., play with his collection of beanie babies and use the computer in his classroom.

M.D. said that he graduated from Barfield Elementary School in May 2000, and entered Riverdale High School in Rutherford County that fall. M.D. said that after he started high school, Defendant contacted him "out of the blue." Defendant asked M.D. if he wanted to work for him as an assistant for the Barfield Elementary School's soccer team, which Defendant coached, and to help Defendant in his classroom. Defendant asked M.D.'s mother, Linda Devine, if her son could work for him, and Ms. Devine agreed. M.D. began working for Defendant two or three times a week, including Saturday when the soccer games were played. Defendant often picked M.D. up at his house when M.D. was scheduled to work for Defendant at the school or at a soccer game. M.D. said Defendant paid him "a lot," sometimes as much as $50.00 to $70.00 for an afternoon of work. M.D. said that he and Defendant spent part of his working time talking about what was going on in M.D.'s life, including M.D.'s feelings about his father and his concerns about fitting into high school. These conversations took place in Defendant's classroom after school was dismissed for the day. M.D. worked for Defendant about one year during which time no inappropriate conduct occurred.

One afternoon after they had attended a soccer game during M.D.'s sophomore year in the fall of 2001, Defendant told M.D. that he needed to drop some equipment off in the classroom. M.D. carried a black bag into the school, and some items in the bag clattered when he set the bag on the floor. M.D. testified that it sounded like video tapes. Defendant asked M.D. to straighten up the classroom. While M.D.'s back was turned, Defendant put a "dirty movie" in the VCR which depicted a man and woman engaging in sexual acts. Defendant asked M.D. what he thought about the movie, and M.D. said that he "started getting really freaked out." Defendant started rubbing M.D.'s back. Defendant touched M.D.'s penis over his clothes and then unzipped his pants and performed fellatio on M.D. M.D. said that he did not do anything to stop Defendant, stating "I didn't know what to do. I just stood there because I didn't know what to think and I was scared." M.D. said that Defendant started moaning "like he really liked it and started calling me, like, going oh baby, and things like that."

M.D. testified:

> [Defendant] just told me not to say anything and what it would do
> to me and people would think about me if they found out that I was
> doing these kind of things. And how they'd call me gay and

> [Defendant told] me all the people that he knew and would always tell me like stories about how he could get people in trouble. . . . [Defendant] took me home, I didn't talk to my mom, I went in the bathroom, and I threw up and my mom asked me what was wrong, and I just said it [was] something I ate. And I just stood in the shower because I felt dirty. Because that was the first time anything ever happened like that at all. I just stood in the shower and that was it. And I just went to bed because I just felt ashamed and embarrassed.

M.D. said that he trusted Defendant and looked up to him. Defendant told him "all the time" that he would take care of M.D. and that M.D. should look to him as his father because Defendant had never had a son.

On a second occasion in Defendant's classroom, Defendant played a video tape of two men engaging in sexual activities. M.D. turned the recorder off because it "grossed him out." Defendant told M.D., "you know, it's not gay, . . . you need it just when you need it." M.D. did not remember any sexual contact on this occasion.

M.D. said one sexual encounter occurred near Halloween. M.D. said that he was dating a girl from Riverdale High School, and he wanted to buy her a gift for her birthday on November 4, 2001. Defendant told M.D. that he could earn some money by cleaning Defendant's classroom. Defendant stopped M.D. while he was working and performed fellatio on him. Defendant again told M.D. not to tell anyone. Defendant warned M.D. that they "had already done it so who could [M.D.] tell without people thinking that [he] was gay." M.D. said that he was scared "and just whenever [Defendant] pretty much wanted to do it [M.D.] let him." M.D. testified that his reputation was very important to him.

M.D. described three separate occasions which involved Defendant performing fellatio on him in the classroom around the holidays of Valentine's Day, Easter, and Christmas; in the elementary school's locker room; and in Defendant's car in Barfield Park after M.D. got his learner's permit to drive. M.D. said Defendant began coming to his house in the morning after his mother left for work. M.D. described three separate sexual encounters which occurred in his bedroom, in the kitchen, and in the living room. M.D. said that Defendant always touched other parts of his body, such as his legs, buttocks, and chest, while he engaged in oral sex. M.D. said that Defendant performed fellatio on him over one hundred times in Defendant's classroom, and twenty-five to thirty times in M.D.'s house. M.D. said that "[i]t became so often, it was like a routine." M.D. testified that Defendant performed oral sex on him about three times a week from sometime in the fall of 2001 until sometime in early 2003.

M.D. said that he was too embarrassed to tell his mother about the encounters. He acknowledged that Defendant gave him money, clothes, and a phone card.

Defendant started doing M.D.'s homework for him. M.D. saved $2,000, and Defendant found him a car to purchase.

M.D. said that he finally "forged up enough courage" and told Defendant he "didn't want to do anything" anymore, and Defendant refrained from sexual contact for four or five months. At some point, Defendant told M.D. that he wanted to marry him and take care of him. Defendant said that M.D. "wouldn't have to worry about anything." M.D. told Defendant that he "couldn't see him that way," and Defendant cried.

In November 2003, a jury convicted Fults of five counts of rape, seven counts of statutory rape, and twelve counts of sexual battery by an authority figure. *Id.* at *1. The rape charges were premised on five instances of fellatio in Fults' classroom and the Barfield Elementary School locker room, and the statutory rape charges were based on seven additional incidents occurring primarily in Fults' classroom and the victim's home. *Id.* *11–13. The facts underlying these two sets of charges also supported the twelve counts of sexual battery. *Id.* at *14. Fults was sentenced in March 2004 to five nine-year terms for the rape convictions, resulting in a combined sentence of forty-five years. *Id.* at *1. The statutory rape and sexual battery convictions did not increase Fults' sentence, as the sentences for those convictions were to be served concurrently to the forty-five year sentence.[1] *Id.*

At the time of Fults' sentencing, a Tennessee statute provided that "[a]bsent enhancing or mitigating factors, the presumptive sentence for Class B, C, D, and E felonies [is] the minimum in the applicable range." *State v. Gomez*, 239 S.W.3d 733, 739 (Tenn. 2007) (*Gomez II*) (citing Tenn. Code Ann. § 40-35-210(c) (Supp. 2001)). Rape is a Class B felony. Because the sentencing range for each of Fults' rape convictions was 8–12 years, the presumptive sentence was eight years per conviction. As permitted by the sentencing scheme, however, the sentencing court increased the sentence for each of the rape convictions to nine years by applying four

---

[1] On direct appeal, the Tennessee Court of Criminal Appeals merged three of Fults' sexual battery convictions with three rape convictions. *Fults*, 2006 WL 1896356, at *16. The court also merged the seven statutory rape convictions with seven sexual battery convictions. *Id.* Fults' effective sentence remained forty-five years.

enhancements. First, tracking the language of the enhancement listed at Tenn. Code Ann. § 40-35-114(4), the court found that "the victim of the offense is particularly vulnerable because of age or physical or mental disability." The court reasoned that Fults "took advantage of [the victim's] situation" because Fults "knew that [the victim] was without a father figure, [was] struggling financially, [and] had some behavior problems in school." Second, applying § 40-35-114(7), the court found that the rapes "w[ere] committed to gratify the defendant's desire for the pleasure or excitement of th[e] act" based on the victim's testimony that Fults moaned during the sexual acts. Third, the court held that in committing the offenses, Fults "abused a position of public or private trust" under § 40-35-114(14). This finding was based primarily on Fults' position as a teacher. Lastly, the court applied the enhancement listed at § 40-35-114(15) because Fults committed the rapes while on school property.

Soon after Fults' sentencing, the Tennessee courts held that the state sentencing scheme—which allowed a court to find facts to enhance a sentence above a presumptive term—did not contravene the Supreme Court's decisions in *Apprendi v. New Jersey*, 530 U.S. 466 (2000) and *Blakely v. Washington*, 542 U.S. 296 (2004). *See State v. Gomez*, 163 S.W.3d 632, 657–59 (Tenn. 2005), *vacated*, 549 U.S. 1190 (2007). In *Apprendi*, the Court held that "[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." 530 U.S. at 490. *Blakely* clarified *Apprendi* by holding that the "statutory maximum" is "the maximum sentence a judge may impose solely on the basis of the facts reflected in the jury verdict or admitted by the defendant." *Blakely*, 542 U.S. at 303 (citations and emphasis omitted). Following the Court's decision in *Cunningham v. California*, 549 U.S. 270, 293 (2007), which invalidated a sentencing scheme nearly identical to Tennessee's, "the Tennessee Supreme Court

acknowledged that [the state's scheme] 'violated the Sixth Amendment as interpreted by the Supreme Court in *Apprendi*, *Blakely*, and *Cunningham*.'" *Lovins v. Parker*, 712 F.3d 283, 289–90 (6th Cir. 2013) (quoting *Gomez II*, 239 S.W.3d at 740). In this case, Warden Qualls has not contested that the sentencing court violated the Sixth Amendment by increasing Fults' sentence for each rape conviction above eight years without submitting the four enhancements to the jury.[2] This judicial fact-finding therefore presumably constitutes a "*Blakely* error."

After unsuccessfully appealing his convictions and sentence on multiple grounds in the state courts, Fults filed a petition in federal court for habeas relief under 28 U.S.C. § 2254. The district court denied the petition. The court dismissed the *Blakely* claim by conducting a brief harmless error analysis:

> Based upon the record, the Court concludes that Petitioner clearly occupied a position of trust as a teacher. By his repeated sexual acts, petitioner abused the minor victim who had mental health issues and did so for a period of eighteen months. Many of the facts that were used to enhance the petitioner['s sentence] by one year were already in evidence before the jury and were necessary factual predicates for the jury's verdict. Thus, the clear majority of the facts that the state court cited to enhance Petitioner's sentences by one year above the minimum sentence, were found by the jury . . . . In this factual context, the Court deems any *Blakely* violation to be harmless.

Fults was granted a certificate of appealability only as to the *Blakely* claim.

Fults' habeas petition must be denied because the *Blakely* error was harmless. We are free of grave doubt that the jury would have found each of the four enhancements if the sentencing court had properly submitted the enhancements to the jury. Because the error related to each enhancement was harmless, this appeal does not require deciding whether a petitioner's *Blakely* claim may be denied if some but not all of the enhancements found by the sentencing

---

[2] In a case with analogous facts, we held that *Blakely* and *Cunningham* applied to a habeas petitioner's sentencing, reasoning that retroactivity principles did not bar the petitioner from bringing a claim based on the holdings in those decisions. *See Lovins*, 712 F.3d at 298–99. Like the petitioner in *Lovins*, Fults' conviction became final after *Blakely* and *Cunningham* were decided.

court are supported by the record. We also decline to reach the question of whether Fults procedurally defaulted his *Blakely* claim by failing to raise it on direct appeal, even though the parties briefed and argued that question. "[F]ederal courts are not required to address a procedural-default issue before deciding against the petitioner on the merits." *Hudson v. Jones*, 351 F.3d 212, 215 (6th Cir. 2003) (citing *Lambrix v. Singletary*, 520 U.S. 518, 525 (1997)). This guidance has particular application in this case, where the procedural-default issue would potentially involve a complex analysis of state post-conviction judgments. We therefore proceed directly to the harmless error analysis.

The sentencing error was harmless because if the court had submitted the four enhancements to the jury, the jury would have found that the victim was particularly vulnerable, Fults committed the rapes to gratify his desire for pleasure or excitement, Fults abused a position of trust, and the rapes occurred on school property. The jury necessarily found the second and third enhancements beyond a reasonable doubt by convicting Fults of sexual battery by an authority figure, and the record contains sufficient evidence to support the remaining two enhancements. Harmless-error review applies because *Blakely* errors are not structural errors. *Villagarcia v. Warden*, 599 F.3d 529, 536 (6th Cir. 2010) (citation omitted). In cases involving collateral review of state decisions, the "state-friendly standard" from *Brecht v. Abrahamson*, 507 U.S. 619 (1993) applies. *Villagarcia*, 599 F.3d at 536 (quoting *Hereford v. Warren*, 536 F.3d 523, 532–33 (6th Cir. 2008)). This harmless-error standard asks whether an error "'had substantial and injurious effect or influence' on the outcome of the case." *Allen v. Parker*, 542 F. App'x 435, 442 (6th Cir. 2013) (quoting *Fry v. Pliler*, 551 U.S. 112, 116 (2007)). In other words, a *Blakely* error is harmless unless there is "grave doubt" as to its harmlessness. *Villagarcia*, 599 F.3d at 537 (quoting *Hereford*, 536 F.3d at 533).

The first enhancement, "victim vulnerability," allows for enhancement of a sentence where a victim "was particularly vulnerable because of age or physical or mental disability." Tenn. Code Ann. § 40-35-114(4). The record supports this enhancement because the victim had attention deficit hyperactivity disorder (ADHD), depended on Fults as a father figure, was concerned about his reputation, and was threatened by Fults. The district court's assessment that the victim was "an emotionally vulnerable student" with "mental health issues" was accordingly strongly supported by the record.

The victim's ADHD—a recognized mental disorder—caused him to forget things, have difficulty passing his classes, and lean on Fults for support. The victim's trial testimony suggests that the victim was emotionally insecure, as he often shared with Fults his concerns about his reputation and fitting in with peers. These concerns could have rendered especially compelling Fults' threat that he would "tell people [the victim] was gay" if the victim exposed Fults' misconduct. In addition, the record indicates that Fults assumed the role of a father with regard to the victim. For instance, the victim testified: "I kind of looked up to [Fults] as my dad, because I didn't really have him around." Similarly, Fults told another teacher that the victim "d[id] not have much support" and Fults admitted that he "ha[d] been acting in the absence of [the victim's] father for some time." Also supporting the victim's vulnerability was his age. Even though he was not a young child at the time of the crimes, that he was fifteen or sixteen made him more vulnerable than an adult to sexual advances by a teacher. These facts amply supported a finding of victim vulnerability.

In addition to vulnerability based on age or physical or mental disability, Tennessee requires a nexus between the vulnerability and the completed crime: "[T]he vulnerabilities of the victim[] [must have] some bearing on, or some logical connection to, 'an inability to resist the

crime, summon help, or testify at a later date.'" *State v. Lewis*, 44 S.W.3d 501, 505 (Tenn. 2001) (quoting *State v. Poole*, 945 S.W.2d 93, 96 (Tenn. 1997)).  This aspect of the victim vulnerability enhancement, too, is compellingly supported by the record.  The victim's age, emotional insecurities, and ADHD, combined with Fults' father-like role, made the victim less capable of resisting Fults' sexual advances.  In sum, the record does not create grave doubt that the jury would have found this enhancement to be satisfied beyond a reasonable doubt.

Fults argues that if this enhancement had been submitted to the jury, the jury could have accepted the defense's trial portrait of the victim, which was of a sexually experienced, homosexual teenager who manipulated Fults into giving him rides to school and buying him things.  This argument is unconvincing.  In this § 2254 case, the question is not whether some evidence in the record supports Fults' version of the events, but whether we have grave doubt that the jury would have found that the victim was particularly vulnerable to Fults' rapes.  As explained above, this enhancement has a sound basis in the record.  Fults' argument is further undercut by the fact that the jury disagreed with the defense portrait of the victim by convicting Fults of rape, statutory rape, and sexual battery by an authority figure, for a total of twenty-four convictions.  This sentencing error was harmless.

The judicial fact-finding related to the second enhancement—which requires a crime to be "committed to gratify the defendant's desire for pleasure or excitement," *see* Tenn. Code Ann. § 40-35-114(7)—was also harmless.  This enhancement "requires 'additional objective evidence [beyond the sex act itself] of the defendant's motivation to seek pleasure or excitement through sexual assault.'"  *Allen*, 542 F. App'x at 443 (alteration in original) (quoting *State v. Arnett*, 49 S.W.3d 250, 262 (Tenn. 2001)).  As an initial matter, the jury in fact found this enhancement by convicting Fults of five counts of sexual battery by an authority figure based on the facts

underlying the five rape charges. Sexual battery by an authority figure requires unlawful sexual contact, which is defined as "touching [that] can be reasonably construed as being for the purpose of sexual arousal or gratification." Tenn. Code Ann. § 39-13-501(6). This definition of sexual contact is nearly identical to the text of the enhancement statute. *See* § 40-35-114(7). Because the jury convicted Fults of sexual battery for the same conduct that led to the rape convictions, the jury would have found that this enhancement was satisfied.

Even if the sexual battery convictions alone do not prove that the judicial fact-finding concerning this enhancement was harmless error, the victim's testimony closes the matter. Words or actions by a defendant may show that a defendant's motive was pleasure and not another motive, such as violence. The court in *State v. Clabo*, 905 S.W.2d 197, 207 (Tenn. Crim. App. 1995), for instance, rejected this enhancement for lack of such words or action. In this case, the victim testified that during the sexual activity, Fults "would just make these like sounds and just start moaning and stuff like he got something off about it, like he enjoyed it . . . . He just started like moaning and stuff like he really liked it and started calling me—going, oh, baby, and things like that." This testimony indicates that Fults' motive was sexual pleasure. Also supporting the sexual gratification enhancement is Fults' act of showing the victim a pornographic video before at least one of the rapes, a fact that the Tennessee courts have recognized provides evidence of sexual gratification. *See, e.g.*, *State v. Aaron*, No. M2002-02288-CCA-R3-CD, 2004 WL 1533825, at *19 (Tenn. Crim. App. July 8, 2004).

Fults suggests that the record does not show that he demonstrated signs of sexual gratification during each rape, but this argument is without merit. When testifying about Fults' moaning, the victim was referring to all of the instances of fellatio, not one discrete event.

Nothing in the record suggests that Fults sought sexual gratification from only some of the rapes. The error related to this enhancement was harmless.

The victim's trial testimony and the sexual battery convictions likewise support the third enhancement, which applies where a defendant "abused a position of public or private trust." Tenn. Code Ann. § 40-35-114(14). This enhancement has two components: a defendant must both occupy and abuse a position of trust. *State v. Kissinger*, 922 S.W.2d 482, 488 (Tenn. 1996). As with the sexual gratification enhancement, the sexual battery convictions support finding the error concerning this enhancement to be harmless because one element of sexual battery requires a defendant to "use[] [a] position of trust or [supervisory or disciplinary] power to accomplish the sexual contact." Tenn. Code Ann. § 39-13-527(a)(3)(A). This element of the crime is nearly identical to the "abuse of position" enhancement. Even if the sexual battery convictions did not resolve the harmless-error question, Fults occupied a position of trust because he was a teacher, employed the victim, and acted as a surrogate father. Fults plainly abused those positions by committing multiple rapes. "The position[s] of parent, step-parent, babysitter, teacher, [and] coach are but a few obvious examples" of positions of trust. *Kissinger*, 922 S.W.2d at 488. Although Fults was not the victim's teacher, Fults inherently occupied a position of trust with regard to students like the victim. Fults also retained supervisory power over the victim by employing him two or three times per week to help with soccer games. Fults did so with the permission of the victim's mother, who "had no problems with [Fults]" in part because he was a teacher. Moreover, Fults assumed a father-like role with regard to the victim, telling the victim to "start looking at me as your dad" and explaining to another teacher that Fults "ha[d] been acting in the absence of [the victim's] father for some time now." Fults thus occupied a position of trust in several capacities.

The facts on this enhancement mirror the facts in *Allen v. Parker*, a recent unpublished decision that also addressed a state prisoner's *Blakely* claim. In that case, we held that the putative *Blakely* error regarding the abuse-of-position enhancement was harmless, reasoning that the victim "lacked a male role model in his life," the "victim's mother approved of the friendship between [the defendant] and [the victim]," and the "victim spent substantial time at [the defendant's] residence under his care and supervision." *Allen*, 542 F. App'x at 444. Like Fults, the petitioner in *Allen* abused his position of trust by raping the minor victim. *Id.* at 437, 444. The same result as in *Allen* obtains in this case.

Lastly, grave doubt does not exist regarding the fourth enhancement, which the sentencing court applied on the basis that each of the five rapes occurred on school property. The jury was presented with five instances of rape—each occurring, as argued by the state, in Fults' classroom or in the Barfield Elementary School locker room—and convicted Fults of all five counts. It is true that the jury was not required to find that the crimes occurred on school property to convict Fults of rape. It is also true that Fults only admitted that "[o]ne or two" of the fellatio incidents occurred on school property.[3] However, nothing in the record suggests that the jury convicted Fults of rape based on a crime occurring outside school grounds. Nor is it likely that the jury would have done so given that every rape charge was premised on conduct occurring at the school. Moreover, the victim's testimony that four of the incidents occurred on school property supports the conclusion that this error was harmless. It is not clear whether the victim testified that the fifth incident occurred on school property, but he nonetheless stated that there was sexual contact in the classroom every time he went there for a period of time, and that the incidents in the classroom "were all pretty much the same." In light of the state's

---

[3] The sentencing court applied this enhancement by reasoning that it "was admitted" that the rapes occurred on school property.

presentation of the case, we are free of grave doubt that the jury would have found that the five

rapes occurred on school property.

The judgment of the district court is affirmed.