NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 17a0059n.06

No. 16-3009

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

**FILED**
Jan 24, 2017
DEBORAH S. HUNT, Clerk

| | | |
|---|---|---|
| DENNIS AUERSWALD, | ) | |
| | ) | |
| Petitioner-Appellant, | ) | ON APPEAL FROM THE |
| | ) | UNITED STATES DISTRICT |
| v. | ) | COURT FOR THE |
| | ) | NORTHERN DISTRICT OF |
| ED SHELDON, Warden, | ) | OHIO |
| | ) | |
| Respondent-Appellee. | ) | |
| | ) | |

Before: BATCHELDER, SUTTON, and KETHLEDGE, Circuit Judges.

KETHLEDGE, Circuit Judge. An Ohio jury convicted Dennis Auerswald of murdering his wife Maureen by poisoning her with antifreeze. After an unsuccessful direct appeal in state court, Auerswald petitioned the district court for a writ of habeas corpus, arguing that the state trial court had improperly excluded exculpatory evidence on hearsay grounds. The district court denied the petition, holding that, even if the state court had erred, the error was harmless. We affirm.

The state proved the following facts at trial. Beginning in 1999, Auerswald abused Maureen regularly. By 2006 the Auerswalds were sleeping in separate bedrooms, and Maureen had told friends that she was "done" with her marriage. Maureen also lost her job in 2006, and as a result, the Auerswalds stopped paying their mortgage. By 2008, they were $40,000 behind and in danger of losing their home. Meanwhile, Maureen had three life insurance policies,

including one with a face value of $100,000. Auerswald was the beneficiary on all three policies.

Auerswald kept a jug of antifreeze in his garage. The antifreeze did not contain a bittering agent, so it was tasteless. On February 7 and 8, 2009, Maureen felt ill and was taking Pepto-Bismol. When Auerswald left for work on the morning of February 9, he knew that Maureen intended to continue taking Pepto-Bismol that day.

Around 6:15 p.m., Auerswald's friend Tom Perz called him. Auerswald told Perz that he had just arrived home to find Maureen unconscious on the floor with a gash in her head and a bottle of vodka next to her. Perz told Auerswald to call an ambulance, but Auerswald refused and instead asked Perz—who lived 30 minutes away—to pick up him and Maureen and drive them to the hospital. Perz did so, and they finally arrived at the emergency room around 7:45 p.m. Auerswald brought Maureen's bottle of Pepto-Bismol to the hospital and threw it away while he was there.

At the hospital, Auerswald told several doctors and nurses that Maureen had passed out from drinking. Blood tests showed that Maureen had no alcohol in her system but that she had ingested ethylene glycol, a chemical commonly found in antifreeze. Without revealing the test results to Auerswald, a doctor asked him if Maureen might have drunk anything other than alcohol that day. Auerswald said that, the night before, Maureen had threatened to drink antifreeze. The doctor then informed Auerswald that, for Maureen to have any chance at surviving, they needed to begin hemodialysis immediately. Auerswald told the doctor not to perform the treatment—he now claims Maureen had a "do not resuscitate" preference—and Maureen died hours later.

Police officers interviewed Auerswald twice about Maureen's death. Contrary to what he told Perz, he told the police that when he found Maureen on the floor, there was no bottle of vodka next to her.

Thereafter, Auerswald was arrested and charged with Maureen's murder. He made bail and, while home, ordered take-out and struck up a conversation with the delivery man. He told the delivery man that his wife was dead, that he had been accused of murdering her, and that he had been in jail because he had "fucked up."

At trial, the prosecution proved the facts recited above. Auerswald then called his boss, Jim Kiraly, as a witness. Kiraly intended to testify that, around 9:00 a.m. on the day Maureen died, he overheard a phone call between her and Auerswald, in which Auerswald told her to "stop taking that stuff and call the doctor." The prosecution objected on hearsay grounds, and the court sustained the objection. The jury later convicted Auerswald of murder, and the court sentenced him to life in prison.

On direct appeal, Auerswald argued that the statement Kiraly had overheard was not hearsay, and that the trial court had erred by excluding it. The Ohio Court of Appeals agreed that the statement was not hearsay, but held that its exclusion was harmless. The Ohio Supreme Court declined to hear Auerswald's case. Auerswald then petitioned the district court for a writ of habeas corpus, making the same argument he had made on direct appeal. The district court held that, even if the state trial court had improperly excluded Kiraly's testimony, the error was harmless. The court therefore denied Auerswald's petition. This appeal followed.

Auerswald argues that excluding Kiraly's testimony was not a harmless error. On habeas review, a "trial error" is harmless unless "the error had substantial and injurious effect or influence in determining the jury's verdict." *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993)

(quotation omitted). Despite Auerswald's assertion to the contrary, the *Brecht* standard applies to all "trial errors," including the improper exclusion of witness testimony. *See Fry v. Pliler*, 551 U.S. 112, 120-22 (2007). Thus, the question here is whether there is a substantial chance that, if jurors had heard Kiraly's testimony, they would have acquitted.

Again, Kiraly would have testified that, around 9:00 a.m. on the day Maureen died, Auerswald told her to "stop taking that stuff and call the doctor." Auerswald asserts that he would not have said that if he had poisoned Maureen because if she had listened she probably would have survived and he probably would have gotten caught. Instead, he says, the only plausible explanation for his statement is that he was genuinely concerned about Maureen.

Yet a jury might see through that explanation rather easily. For example, a jury might think that, since Maureen had been taking Pepto-Bismol for two days, she had already drunk enough antifreeze to kill her—and that Auerswald knew it. A jury might also think that a doctor would not figure out, during a routine office visit, that Maureen had ingested antifreeze, of all things—and that Auerswald knew that too. Thus, the jury might conclude that Auerswald told Maureen to call the doctor—within earshot of his boss, as it turned out—precisely because he thought that doing so would not save Maureen but would seem exculpatory later on. Even considered on its own terms, therefore, the excluded statement is not nearly as exculpatory as Auerswald says it is.

The statement's effect diminishes further when one considers the other evidence presented at trial. Auerswald needed $40,000 to avoid foreclosure, and by killing Maureen he would get at least $100,000 in life-insurance proceeds. He had antifreeze in his garage; he knew Maureen would be taking Pepto-Bismol on February 9; and he threw the Pepto-Bismol bottle away before police could test it. Moreover, when Auerswald found Maureen unconscious, he

inexplicably (but for murderous intent, it would seem) did not call an ambulance or drive her to the hospital himself; instead, he waited 30 minutes for Perz to pick them up. Once at the hospital, Auerswald insisted that Maureen had been drinking (even though, as he later admitted to the police, he had found no alcohol near her body) and eventually refused the only treatment that might have saved her life. Finally, after Maureen's death, Auerswald told a delivery man that his wife was dead, that he had been accused of killing her, and that he had been in jail because he had "fucked up." Given all that evidence, Kiraly's testimony about Auerswald's self-serving statement would not have had a substantial effect on the jury. The statement's exclusion was therefore harmless.

The district court's judgment is affirmed.